4294

```
 1   A    No.

 2   Q    You would only include data that made your point?

 3   A    I would include in the declaration representative of

 4   reliable and conclusive data.

 5   Q    If the data were equivocal would you include it?

 6   A    Not -- I think you have to provide representative data.

 7   Q    Is that what Dr. Atkinson told you?

 8   A    No.

 9   Q    That was your own decision?

10   A    Yes, I wrote the declaration.  It was my decision what

11   information went into the declaration.

12   Q    You wrote the declaration?

13   A    I did.

14   Q    Did you write all the drafts of it?

15   A    Yes, I wrote all the drafts of it in the sense that

16   it's my declaration and I did all the judgments and provided

17   all the technical information.  You have to bear in mind this

18   was the first declaration I was ever involved in.  Obviously

19   there's a legal component associated with the declaration.  I

20   needed guidance in providing the legal framework associated

21   with it.  I couldn't draft that entirely on my own.

22   Q    You did read it before you signed it; is that correct?

23   A    Yes.

24   Q    And you affirmed that it was your affidavit?

25   A    Oh, yeah.
```

WALLS REPORTING, INC.
714 PARK AVENUE, BALTIMORE, MD 21201
410-728-9020    FAX 410-728-9024

CONFIDENTIAL UNDER PROTECTIVE ORDER

G028310

4334

1        MR. RUBIN:  I have no more questions.

2        MR. LEWIN:  No redirect, Your Honor.

3        THE COURT:  Dr. Hempenstall, when did you learn

4    that you were being charged with misconduct in this case?  Do

5    you recall when you first became conscious of that.

6        THE WITNESS:  Sometime after February, after my

7    deposition.

8        THE COURT:  Part of what is being urged on the

9    Court in this case is an argument that basically says this:

10   The UK ingredients were essentially the same as the U.S.

11   ingredients.  On what rational basis would one acting in good

12   faith exclude test results that were equivocal or unfavorable

13   on the same ingredients?

14       THE WITNESS:  I think if the data makes you believe

15   there is something odd about the results, then that is reason

16   to do so, to set them aside, and that's the judgment that I

17   made.

18       THE COURT:  A possible response to that is under

19   that approach if you have a set of data 50 percent of which

20   is what you might call bad because it's not consistent with

21   the hypothesis, and 50 percent of it is consistent with the

22   hypothesis, under your approach, arguably, you exclude the

23   bad 50 percent and submit the other 50 percent and represent

24   it as the data.  Do you see how that argument can be

25   formulated?

WALLS REPORTING, INC.
714 PARK AVENUE, BALTIMORE, MD 21201
410-728-9020    FAX 410-728-9024

CONFIDENTIAL UNDER PROTECTIVE ORDER                    G028350

4335

1       THE WITNESS:  I can see your point.  As I said, I

2  looked at the data as a whole, I saw inconsistencies and

3  problems in terms of the SP88/026 and I could have included

4  the data at 20 degrees, but if I had taken that out and used

5  it like that I would be accused of taking it out of context.

6  It's easier to say there is something wrong here, let's put

7  it to one side and look at the rest of the data.  We have

8  three other programs and they all clearly show an enhancing

9  effect.

10       THE COURT:  Has 20-degree data ever been used, in

11  your experience?

12       THE WITNESS:  It depends what you are trying to do.

13       THE COURT:  On the formulation?

14       THE WITNESS:  On this formulation I don't know.  It

15  all depends what you are trying to do.  As I was pointing out

16  before, if the conditions of the tests don't allow enough

17  change in something to occur, whether 20 or 50 or whatever,

18  you can't look for differences.

19       THE COURT:  You are suggesting that there may be,

20  and I suppose there are formulations for which the absence of

21  change that you have described at 20 degrees when it comes to

22  ranitidine would be true at 50 or perhaps -- well, I don't

23  suppose true at 50, but at other temperature points, and you

24  would exclude the data.

25       THE WITNESS:  Well, no, I'm not saying that.  I'm

WALLS REPORTING, INC.
714 PARK AVENUE, BALTIMORE, MD 21201
410-728-9020    FAX 410-728-9024

CONFIDENTIAL UNDER PROTECTIVE ORDER          G028351

4336

1    saying if you are looking, if you are setting up a study to

2    look for a difference between two things, then that study

3    must bring about a certain amount of change.

4              THE COURT:  Right.

5              THE WITNESS:  For ranitidine for Zantac Syrup, or

6    formulation at 20 degrees, there isn't enough change.

7              THE COURT:  What I'm trying to get at --

8              THE WITNESS:  There might be enough change at 20

9    degrees in another product.

10             THE COURT:  I'm trying to ask you in your

11   experience can you give us any other examples of a

12   temperature point where the change was so di minimis, so

13   unmeasurable or so insignificant that you would disregard

14   data at that temperature point?

15             THE WITNESS:  If you are looking for differences,

16   then there are.

17             THE COURT:  Give us an example.

18             THE WITNESS:  Ranitidine syrup.

19             THE COURT:  Move away from ranitidine.

20             THE WITNESS:  If you have a stable product which in

21   formulation one is very stable, doesn't change, if you add

22   another set of ingredients to it, it's so chemically stable,

23   if you put those both on test at 20 or at 50 you may find

24   there is no difference after a period of time.  Although the

25   different ingredients may want to interact with the active

WALLS REPORTING, INC.
714 PARK AVENUE, BALTIMORE, MD 21201
410-728-9020     FAX 410-728-9024

**CONFIDENTIAL UNDER PROTECTIVE ORDER**     G028352

4337

1  ingredient in a different way.  Because there is no change

2  occurring you can't compare them.

3          THE COURT:  Let me try it one more time.  Can you

4  give us in your experience a specific formulation where you

5  have encountered the same oddity, namely where you have

6  sought to measure changes in stability but that the

7  degradation rate at a particular temperature point was so

8  small that you discounted or excluded data included at that

9  temperature rate?

10         THE WITNESS:  This is the only occasion where it

11  was compared formally in this way.

12         THE COURT:  You have no comparable experience?

13         THE WITNESS:  No, I can't provide it.

14         THE COURT:  You can see why then the hypothesis

15  that it was okay to exclude the 20-degree data is untestable.

16  If you can't give us an example of where it might have

17  occurred in some other instance, then Dr. Carstensen is sort

18  of left to say this is insupportable and no scientist would

19  do this.  Which is essentially what he said here.

20         THE WITNESS:  That is why you carry out the test

21  under accelerated conditions, to bring about this change.  It

22  gives you a more reliable set of figures to analyze.

23         THE COURT:  Okay.  The problem is that defendants

24  here are arguing that you took a heads I win, tails you lose

25  approach to your data.  That you conveniently, according to

WALLS REPORTING, INC.
714 PARK AVENUE, BALTIMORE, MD 21201
410-728-9020    FAX 410-728-9024

CONFIDENTIAL UNDER PROTECTIVE ORDER        G028353

4338

1    the defendants, have formulated, to coin a phrase, a

2    rationale for getting rid of that which doesn't work, albeit

3    in the course of getting rid of that which doesn't work,

4    i.e., some of the UK data, you also got rid of some of the

5    good UK data.  You threw it all out, you didn't need it in

6    your approach because you had this U.S. data.  But what the

7    defendants are arguing is that it was data based on the same

8    formulation.

9            THE WITNESS:  Yes.

10           THE COURT:  And so how is it any different than if

11   you had simply run a few more batches on the U.S. ingredients

12   and come up with the same bad data you wouldn't have excluded

13   that, presumably?  So part of the question is how can you

14   slice the melon quite where you sliced it?  You have one

15   melon and you say I'm going to eat the good part of this

16   melon, but you don't know which is the good part until you

17   cut it open.  You cut it open, look at it and see which is

18   the good part and which is the bad part.  You discard the bad

19   part and say I had a wonderful melon.

20           THE WITNESS:  As I say, I don't think that the

21   20-degree data is appropriate.  It's unreliable because of

22   the errors in things like analysis.  You actually get a wrong

23   result that way.

24           THE COURT:  The problem is you don't have any

25   other --

WALLS REPORTING, INC.
714 PARK AVENUE, BALTIMORE, MD 21201
410-728-9020     FAX 410-728-9024

CONFIDENTIAL UNDER PROTECTIVE ORDER                G028354

4339

1   THE WITNESS:  I have no similar example to give I'm
2   afraid.

3   THE COURT:  That makes your job more difficult and
4   my job perhaps more difficult.  What about the half melon
5   analogy, does that make sense?

6   THE WITNESS:  I take your point.

7   THE COURT:  You take a crayon and on one half of
8   the melon you write UK and the other half you write U.S. and
9   you discard the UK half and represent to the Patent Office,
10  this is their argument, that you had a great melon here, and
11  this is a melon that nobody anticipated but in fact rotten
12  melons come all the time.

13  THE WITNESS:  If you look at all the data it's
14  overwhelming that there is an effect of ethanol.  I explained
15  how I went through all the process.  There are four studies
16  here.  The UK, there is some good data in the UK, the U.S.,
17  the Zantac Syrup with different concentrations and the
18  ranitidine solution.  Three are very supportive.  The UK it's
19  difficult.

20  THE COURT:  Okay.

21  THE WITNESS:  I believe what I did was appropriate.
22  If I was asked to do this again I would do it the same way.

23  THE COURT:  Not to prolong this, any further
24  questions?

25  MR. RUBIN:  No, Your Honor.

CONFIDENTIAL UNDER PROTECTIVE ORDER    G028355