IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GLAXO GROUP LIMITED | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-171-KAJ |
| | ) | |
| TEVA PHARMACEUTICALS USA, INC. and | ) | **CONFIDENTIAL** |
| TEVA PHARMACEUTICAL INDUSTRIES | ) | **FILED UNDER SEAL** |
| LIMITED | ) | |
| | ) | |
| Defendants. | ) | |

**APPENDIX SUPPORTING TEVA'S BRIEF IN OPPOSITION TO GLAXO'S MOTION
FOR SUMMARY JUDGMENT OF PATENT INFRINGEMENT**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Josy Ingersoll (# 1088)
Adam W. Poff (#3990)
Karen E. Keller (#4489)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6600
kkeller@ycst.com

Mark D. Schuman (Pro Hac Vice)
Ronald A. Daignault (Pro Hac Vice)
Jeffer Ali (Pro Hac Vice)
Jeffrey C. Brown (Pro Hac Vice)
MERCHANT & GOULD P.C.
3200 IDS Center
80 South 8th Street
Minneapolis, MN 55402

*Attorneys for Defendants Teva Pharmaceuticals USA, Inc.
and Teva Pharmaceutical Industries, Ltd.*

## TABLE OF CONTENTS

| Exhibit Number | Appendix Number | Description |
|---|---|---|
| 15 | A072-A099 | Expert Report of Professor Arthur H. Kibbe dated March 14, 2006 |
| 16 | A100-A117 | Rebuttal Expert Report of Professor Arthur H. Kibbe dated April 24, 2006 |
| 17 | A118-A142 | Excerpts from the deposition of Bradley Anderson taken June 8, 2006 |
| 18 | A143-A157 | Excerpts from the Expert Report of Bradley Anderson dated March 16, 2006 |
| 19 | A158 | Table of Excipient Function, Teva document T00167 |
| 20 | A159-A167 | Excerpts from the Rebuttal Expert Report of Bradley Anderson dated April 24, 2006 |
| 21 | A168-A170 | U.S. Patent 4,585,790 to Padfield |
| 22 | A171 | Berns letter to Puppa dated February 11, 2005 |
| 23 | A172-A173 | Teva Press Release dated April 5, 2000, announcing completion of Novopharm Acquisition |
| 24 | A174-A183 | Excerpts from the deposition of Tamas Szederkenyi dated May 19, 2005 |
| 25 | A184-A205 | Deposition Exhibit 7, Novopharm documents produced by Teva |
| 26 | A206-A221 | Excerpts from the deposition of Margaret Wrigley taken March 22, 2006 |
| 27 | A222-A226 | Excerpts from the deposition of John Fernandes taken March 3, 2006 |
| 28 | A227-A231 | *Liafail, Inc. v. Learning 2000, Inc.*, 2002 U.S. Dist. LEXIS 24803 (D. Del 2002) |
| 29 | A232-A233 | Excerpts from the deposition of Subrata Mazumder taken January 12, 2006 |
| 30 | A234-A235 | Excerpts from the transcript of the hearing dated June 30, 2005 |
| 31 | A236-A243 | Excerpts from the transcript of the hearing dated October 7, 2005 |

| 32 | A244-A249 | *Petrocelli v. DaimlerChrysler Corp.*, 2006 U.S. Dist. LEXIS 11972 (D. Del. 2006) |
| 33 | A250-A252 | *Microsoft Corp. v. IQ Tech., Inc.*, 1993 U.S. App. LEXIS 16128 (Fed. Cir. 1993) |

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT 15

**Fully
Redacted**

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT 16

**Fully
Redacted**

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT 17

**Fully
Redacted**

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT 18

**Fully
Redacted**

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT 19

**Fully
Redacted**

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT 20

**Fully
Redacted**

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT 21

# United States Patent [19]

## Padfield et al.

[11]  Patent Number:     **4,585,790**

[45]  Date of Patent:     **Apr. 29, 1986**

[54]  **PHARMACEUTICAL COMPOSITIONS**

[75]  Inventors:  John M. Padfield, Meldreth; Ian K. Winterborn, Stevenage, both of England

[73]  Assignee:  Glaxo Group Limited, London, England

[21]  Appl. No.:  **609,215**

[22]  Filed:  **May 11, 1984**

[30]  **Foreign Application Priority Data**

May 13, 1983  [GB]  United Kingdom ............... 83 13217

[51]  Int. Cl.⁴ ....................................... **A61K 31/34**
[52]  U.S. Cl. ..................................................... **514/471**
[58]  Field of Search ........................... 424/285; 514/471

[56]  **References Cited**

**PUBLICATIONS**

Chem. Abst. Chem. Sub Index, 97–Ch–Io (1982)–CS2694 98–C–F (1983)–CS 2853.

*Primary Examiner*—Stanley J. Friedman
*Attorney, Agent, or Firm*—Bacon & Thomas

[57]  **ABSTRACT**

Aqueous formulations of raniditine have been found to have enhanced shelf life provided that they are formulated with a pH in the range 6.5—7.5. Suitable aqueous formulations include injections for intravenous and intramuscular administration, continuous infusions and oral preparations such as syrups.

**13 Claims, No Drawings**

**EXHIBIT**

21

A168

4,585,790

**1**

## PHARMACEUTICAL COMPOSITIONS

The present invention relates to a pharmaceutical composition containing as active ingredient the histamine $H_2$ antagonist ranitidine.

Ranitidine [N-[2-[[[5-(dimethylamino)methyl-2-furanyl]methyl]thio]ethyl]-N′-methyl-2-nitro-1,1-ethenediamine] and its physiologically acceptable salts are described in British Patent Specification No. 1565966. In that specification there is reference to liquid formulations for oral and parenteral administrations and there is a description of an aqueous based formulation for intravenous administration and another of an oral syrup. Both of these formulations contain sufficient hydrochloric acid to achieve a pH of 5.0. In addition injection formulations are described by Padfield et al (The Chemical Use of Ranitidine, Medicine Publishing Foundation Symposium Series 5, Oxford:Medicine Publishing Formulation 1982 pp 18–22) in the form of a simple aqueous solution of ranitidine hydrochloride at its natural pH, i.e. about 5.5. Whilst such formulations containing ranitidine and/or its physiologically acceptable salts are therapeutically effective they suffer from the disadvantage of having a relatively short shelf life due to the breakdown of the ranitidine.

We have now surprisingly found that the shelf life of aqueous based formulations containing ranitidine and-/or one or more of its physiologically acceptable salts may be significantly enhanced if the pH of the formulation is adjusted within the range of 6.5–7.5.

Thus the present invention provides a pharmaceutical composition which is an aqueous formulation of ranitidine and/or one or more physiologically acceptable salt thereof, having a pH within the range of 6.5–7.5. The aqueous formulation is prepared using ingredients of a purity such that it is suitable for administration to patients.

The aqueous based ranitidine formulations according to the invention are particularly stable when compared with formulations at a lower pH. Thus for example, in the case of a 25 mg/ml ranitidine hydrochloride injection solution buffered to the appropriate pH and with phosphate salts and subjected to storage at 20° C., the rate of breakdown of the ranitidine is about ten times faster for a solution buffered to pH 5.5 than for a solution buffered to pH 7.0.

Conveniently the pH of the formulation according to the invention is adjusted on manufacture within the range 6.5–7.5 by means of the use of suitable buffer salts, for example, potassium dihydrogen orthophosphate and disodium hydrogen orthophosphate or citric acid and disodium hydrogen orthophosphate.

Preferred formulations according to the invention are those wherein the pH is within the range 6.7 to 7.3, for example 6.8 to 7.1.

A preferred embodiment of the invention is an aqueous formulation for parenteral administration. Such a formulation may comprise water suitable for injections in which is dissolved ranitidine and/or one or more of its physiologically acceptable salts and suitable buffer salts. Preferably the solution is adjusted to tonicity by the addition of the appropriate conventional excipients e.g. sodium chloride. Optionally the composition may also contain an antimicrobial preservative, for example phenol.

The concentration of ranitidine in formulations suitable for injection, e.g. intravenous or intramuscular

**2**

injection is conveniently within the range 10–100 mg/ml, for example 25 mg/ml, expressed as free base. If desired, the solution may be diluted prior to use with, for example, an isotonic saline solution or a dextrose solution. Solutions suitable for continuous infusion may have a concentration of ranitidine of 0.1–2.0 mg/ml, preferably 0.5–1.0 mg/ml, expressed as free base. The solutions for continuous infusion may be presented in this form, for example in packs of 50–100 ml, or may be presented in a more concentrated form, i.e. 10–100 mg/ml, e.g. 25 mg/ml, for subsequent dilution before use, with, for example, an isotonic saline solution or a dextrose solution.

The aqueous formulations for parenteral administration are conveniently prepared by dissolving ranitidine and/or one or more of its physiologically acceptable salts and the excipients in water suitable for injection. The solution, which conveniently is sparged with an inert gas such as nitrogen, is sterilised preferably by filtration and then aseptically packed into suitable containers, e.g. ampoules, vials or containers for infusion, under an atmosphere of nitrogen. Alternatively the formulation may be terminally sterilized, for example by heating.

A further preferred embodiment of the invention is an aqueous formulation for oral administration. Such a formulation may comprise ranitidine and/or one or more of its physiologically acceptable salts dissolved in water, together with buffer salts, a preservative and a viscosity enhancing agent. Optionally the composition may also contain other conventional excipients such as a sweetener, a flavour and/or flavouring aids.

Suitable buffer salts for the oral formulation include potassium dihydrogen orthophosphate and disodium hydrogen orthophosphate or citric acid and disodium hydrogen orthophosphate.

Examples of suitable viscosity enhancing agents include Xanthan gum, sorbitol, glycerol, sucrose or a cellulose derivative such as carboxymethyl cellulose or an ether thereof such as an alkyl and/or a hydroxyalkyl ether of cellulose as for example hydroxypropyl methylcellulose.

Suitable preservatives include the alkyl hydroxylbenzoates, such as methyl, ethyl, propyl and/or butyl hydroxybenzoates.

Suitable sweeteners include saccharin sodium, sodium cyclamate, sorbitol and sucrose.

The concentration of ranitidine in the oral formulation, expressed as free base in conveniently within the range of 20–400 mg per 10 ml, for example 20–200 mg per 10 ml, more particularly 150 mg per 10 ml dose.

The aqueous formulations for oral administration are conveniently prepared by adding an aqueous solution of ranitidine and/or one or more of its salts together with the other excipients to an aqueous solution or dispersion of the viscosity enhancing agent.

The aqueous formulations according to the invention are preferably prepared using ranitidine in the form of its hydrochloride salt.

Illustrative examples of formulations according to the invention are as follows. In these examples the relative proportions of ranitidine hydrochloride and buffer salts are such that each formulation has a pH of approximately 7.

**A169**

4,585,790

3

| Ranitidine Injection for Intravenous administration (25 mg/ml) | |
|---|---|
| Example 1 | mg/ml |
| Ranitidine hydrochloride | 28 |
| Potassium dihydrogen orthophosphate | 0.96 |
| Disodium hydrogen orthophosphate, anhydrous | 2.4 |
| Phenol BP | 5 |
| Water Suitable for Injections BP to | 1 ml |

Ranitidine hydrochloride, the buffer salts and the phenol were dissolved in Water for Injection. The solution was sparged with nitrogen, sterilised by filtration and then aseptically packed into vials under an atmosphere of nitrogen and sealed with a suitable closure.

| Example 2 | mg/ml |
|---|---|
| Ranitidine hydrochloride | 28 |
| Potassium dihydrogen orthophosphate | 0.96 |
| Disodium hydrogen orthophosphate, anhydrous | 2.4 |
| Sodium chloride BP | 1.6 |
| Water Suitable for Injections BP to | 1 ml |

An aqueous solution of the ranitidine hydrochloride, the buffer salts and sodium chloride was prepared using Water for Injection. The solution was sparged with nitrogen, sterilised by filtration and then aseptically packed into ampoules under an atmosphere of nitrogen.

| Ranitidine oral liquid formulation (150 mg/10 ml) | |
|---|---|
| Example 3 | % w/v |
| Ranitidine hydrochloride | 1.68 |
| Hydroxypropyl methylcellulose | q.s. |
| Parabens (preservative) | q.s. |
| Potassium dihydrogen orthophosphate | 0.095 |
| Disodium hydrogen orthophosphate, anhydrous | 0.350 |
| Sweetening agent(s) | q.s. |
| Flavour | q.s. |
| Purified Water BP to | 100 ml |

A solution of the ranitidine hydrochloride together with the other excipients, except hydroxypropyl methylcellulose, in purified water was added with mixing to a dispersion of the hydroxypropyl methylcellulose in purified water.

4

| Ranitidine formulations for intravenous infusion. | | |
|---|---|---|
| | Example 4 For a 50 ml Infusion mg/ml | Example 5 For a 100 ml Infusion mg/ml |
| Ranitidine hydrochloride | 1.12 | 0.56 |
| Citric acid BP | 0.3 | 0.3 |
| Disodium hydrogen ortho-phosphate, anhydrous | 1.8 | 1.8 |
| Sodium chloride BP | 4.5 | 4.5 |
| Water Suitable for Injections BP | to 50.0 ml | to 100.0 ml |

An aqueous solution of the ranitidine hydrochloride, the buffer salts and the sodium chloride is prepared using Water for Injections. The solution is sparged with nitrogen, filled into containers suitable for administering the solution by intravenous infusion, and sterilised by autoclaving.

We claim:

1. A pharmaceutical composition which is an aqueous formulation containing an effective amount of ranitidine and/or one or more physiologically acceptable salts thereof for treatment of conditions mediated through histamine $H_2$-receptors, said formulation having a pH within the range of 6.5~7.5.

2. A pharmaceutical composition according to claim 1 having a pH in the range 6.7 to 7.3.

3. A pharmaceutical composition according to claim 1 having a pH in the range 6.8 to 7.1.

4. A pharmaceutical composition according to claim 1 in which said pH is adjusted by means of suitable buffer salts.

5. A pharmaceutical composition according to claim 4 in which said buffer salts are potassium dihydrogen orthophosphate and disodium hydrogen orthophosphate or citric acid and disodium hydrogen orthophosphate.

6. A pharmaceutical composition according to claim 1 in a form suitable for parenteral administration.

7. A pharmaceutical composition according to claim 6 in a form suitable for injection and containing 10 to 100 mg/ml ranitidine, expressed as free base.

8. A pharmaceutical composition according to claim 6 in a form suitable for continuous infusion and containing 0.1~2.0 mg/ml ranititine, expressed as free base.

9. A pharmaceutical composition according to claim 1 in a form suitable for oral administration.

10. A pharmaceutical composition according to claim 9 containing 20~400 mg per 10 ml dose.

11. A pharmaceutical composition according to claim 1 containing ranitidine in the form of its hydrochloride salt.

12. A process for the production of a composition of claim 1 suitable for parenteral administration, which comprises dissolving ranitidine and/or one or more physiologically acceptable salts thereof and said remaining constituents in water suitable for injection, followed by sterilisation.

13. A process for the production of a composition of claim 1 suitable for oral administration which comprises adding an aqueous solution of ranitidine and/or one or more physiologically acceptable salts thereof to an aqueous solution or dispersion of a viscosity enhancing agent.

* * * * *

A170

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT 22

REDACTED VERSION – PUBLICLY FILED

# Merchant & Gould

An Intellectual Property Law Firm

3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota
55402-2215 USA
TEL 612.332.5300
FAX 612.332.9081
www.merchant-gould.com

A Professional Corporation

Direct Contact | 612.371.5314
jberns@merchant-gould.com

February 11, 2005

Thomas J. Puppa, Esq.                                    **VIA FEDERAL EXPRESS**

Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY  10178-0060

Re:    Glaxo Group Limited v. Teva Pharmaceuticals USA, Inc. and
       Teva Pharmaceutical Industries Limited, Civil Action No. 04-171
       Our File: M&G 14577.6-US-ZA

Dear Mr. Puppa:

Enclosed for production please find documents T06573-T7609, produced to Glaxo
pursuant to the protective order in the above captioned case.

Very truly yours,

John M. Berns

JMB:rlr

EXHIBIT

22

Minneapolis/St. Paul
Denver
Seattle
Atlanta
Washington, DC

A171

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT 23

REDACTED VERSION – PUBLICLY FILED



## Press Release

**Teva Announces Completion of Novopharm Acquisition**

**Jerusalem, Israel, April 5, 2000** - Teva Pharmaceutical Industries Ltd, (Nasdaq: TEVA) announced today that it has completed the previously announced acquisition of Novopharm Ltd. Novopharm is the second largest generic drug company in Canada and has substantial operations in the United States and Hungary.

Under the terms of the transactions, and as previously disclosed, Dan Family Holdings, the sole shareholder of Novopharm received equity securities representing approximately 6.2% of Teva's outstanding shares. Initially, approximately 6.2 million of such securities will be in the form of exchangeable shares in a Canadian subsidiary of Teva, which are exchangeable into an equal number of Teva Ordinary Shares, with the balance of approximately 2.1 million securities being issued in the form of Teva Ordinay Shares. Under the rules of the Tel-Aviv Stock Exchange, all the securities will initially be held by a trustee in Israel, to be released in installments over the next 18 months.

Teva also announced today that it had signed an agreement with the Hungarian Privatization Authority for the acquisition of a 25% interest in Human Serum & Pharmaceutical Manufacturing Co. Ltd. for $8 million, in cash. Novopharm already owns 55% of Human. The balance of Human's shares are traded on the Budapest Stock Exchange.

Teva Pharmaceutical Industries Ltd., is Israel's largest pharmaceutical company, with more than 80% of its sales outside Israel, mainly in the United States and Europe. The Company develops, manufactures and markets generic and branded human pharmaceuticals and active pharmaceutical ingredients.

**A172**

Safe Harbor Statement under the U. S. Private Securities Litigation Reform Act of 1995: This release contains forward-looking statements, which express the current beliefs and expectations of management. Such statements are based on current expectations and involve a number of known and unknown risks and uncertainties that could cause Teva?s future results, performance or achievements to differ significantly from the results, performance or achievements expressed or implied by such forward-looking statements. Important factors that could cause or contribute to such differences include Teva?s ability to successfully develop and commercialize additional pharmaceutical products, the introduction of competitive generic products, the impact of competition from brand-name companies that sell their own generic products or successfully extend the exclusivity period of their branded products, Teva?s ability to rapidly integrate the operations of acquired businesses, the availability of product liability coverage in the current insurance market, the impact of pharmaceutical industry regulation and pending legislation that could affect the pharmaceutical industry, the difficulty of predicting U.S. Food and Drug Administration (?FDA?) and other

REDACTED VERSION – PUBLICLY FILED

regulatory authority approvals, the regulatory environment and changes in the health policies and structure of various countries, acceptance and demand for new pharmaceutical products and new therapies, uncertainties regarding market acceptance of innovative products newly launched, currently being sold or in development, the impact of restructuring of clients, reliance on strategic alliances, exposure to product liability claims, dependence on patent and other protections for innovative products, fluctuations in currency, exchange and interest rates, operating results and other factors that are discussed in Teva's Annual Report on Form 20-F and its other filings with the U.S. Securities and Exchange Commission (?SEC?). Forward-looking statements speak only as of the date on which they are made, and the Company undertakes no obligation to update publicly or revise any forward-looking statement, whether as a result of new information, future developments or otherwise.

**Company Contacts:**
Dan Suesskind
Chief Financial Officer
Teva Pharmaceutical Industries Ltd
(011) 972-2-589-2840

**Investor Relations Contacts:**
Donna N. Stein/Sonya Park/Jill Meleski
Morgen Walke Associates, Inc.
(212) 850-5600

**Press Contact:**
Greg Tiberend
Morgen Walke Associates, Inc.
(212) 850-5600

Legal Note | Site Map                                    Copyright © 1999 - 2006 Teva. All rights reserved

A173

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT 24

**Fully
Redacted**

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT 25

**Fully
Redacted**

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT 26

**Fully
Redacted**

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT 27

**Fully
Redacted**

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT 28



LEXSEE 2002 US DIST LEXIS 24803

**LIAFAIL, INC., Plaintiff and Counterclaim Defendant v. LEARNING 2000, INC., JAMES RICHARD STORY, III, individually, ANTONIO SANTINI, individually, ILC, INC., SFD, INC., and S & S ENTERPRISES, Defendants and Counterclaim Plaintiffs and Third-Party Plaintiffs, v. FRANK STUCKI, Third-Party Defendant.**

**CONSOLIDATED C.A. No. 01-599 GMS and C.A. No. 01-678 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2002 U.S. Dist. LEXIS 24803*

**December 23, 2002, Decided**

**SUBSEQUENT HISTORY:** Motion granted by, in part, Motion denied by, in part *Liafail, Inc. v. Learning 2000, Inc., 2003 U.S. Dist. LEXIS 3545* (D. Del., Mar. 3, 2003)

**PRIOR HISTORY:** *Liafail, Inc. v. Learning 2000, Inc., 2002 U.S. Dist. LEXIS 22620* (D. Del., Nov. 25, 2002)

**DISPOSITION:** [*1] L2K's Motion for Relief from Spoliation of Evidence GRANTED. L2K's requests for costs as a result of Liafail's alleged misconduct DENIED.

**COUNSEL:** For Liafail Inc, PLAINTIFF: Michael P Kelly, A Richard Winchester, McCarter & English, Wilmington, DE USA.

For Learning 2000 Inc, PLAINTIFF: Martina Bernstein, Sean K Hornbeck, Hornbeck & Associates, Hockessin, DE USA.

For Learning 2000 Inc, James Richard Story, III, Antonio Santini, ILC Inc, SFD Inc, S & S Enterprises, DE-FENDANTS: Martina Bernstein, Sean K Hornbeck, Hornbeck & Associates, Hockessin, DE USA.

For Liafail Inc, Frank Stucki, Robert E Stucki, DEFEN-DANTS: Michael P Kelly, A Richard Winchester, McCarter & English, Wilmington, DE USA.

For Learning 2000 Inc, James Richard Story, III, Antonio Santini, ILC Inc, SFD Inc, S & S Enterprises, THIRD-PARTY PLAINTIFFS: Sean K Hornbeck, Hornbeck & Associates, Hockessin, DE USA.

For Learning 2000 Inc, James Richard Story, III, Antonio Santini, ILC Inc, SFD Inc, S & S Enterprises, COUNTER-CLAIMANTS: Sean K Hornbeck, Hornbeck & Associates, Hockessin, DE USA.

For Liafail Inc, COUNTER-DEFENDANT: Michael P Kelly, A Richard Winchester, McCarter & English, Wilmington, [*2] DE USA.

**JUDGES:** Gregory M. Sleet, UNITED STATES DIS-TRICT JUDGE.

**OPINIONBY:** Gregory M. Sleet

**OPINION:**

**MEMORANDUM AND ORDER**

**I. INTRODUCTION**

On June 5, 2001, the plaintiff and counter-claim defendant, Liafail, Inc. ("Liafail") filed a complaint in the United States District Court for the Western District of Kentucky, setting forth various contractual theories of liability. The United States District Court for the Western District of Kentucky transferred this case to the United States District Court for the District of Delaware on August 29, 2001. This case became Civil Action Number 01-599-GMS.

On October 9, 2001, Learning 2000, Inc ("L2K") commenced Civil Action Number 01-678-GMS in the United States District Court for the District of Delaware. In that complaint, L2K alleges that Liafail violated, *inter alia*, Section 43 of the Lanham Act, *15 U.S.C. § 1125(a)*; Section 2532 of the Delaware Uniform Deceptive Trade Practices Act; and the Anti-Cybersquatting Consumer Protection Act, *15 U.S.C. § 1125(d)*.

By stipulation of the parties, the court consolidated Civil Actions 01-599-GMS and 01-678-GMS on November 2, 2001.

Case 1:04-cv-00171-GMS     Document 142     Filed 08/04/2006     Page 25 of 52

REDACTED VERSION – PUBLICLY FILED

Page 2
2002 U.S. Dist. LEXIS 24803, *

Presently before [*3] the court is L2K's motion for relief from spoliation of evidence. For the following reasons, the court will grant this motion in part.

## II. BACKGROUND

On October 30, 2001, pursuant to *Federal Rule of Civil Procedure 26(a)(1)*, Liafail identified its national sales manager, Steve Sborov ("Sborov") as "likely to have discoverable information concerning the writings at issue in Liafail's complaint and/ or Liafail's claims, contentions or defenses relating thereto; including, but not limited to, discoverable information concerning the day-to-day operations of Learning 2000; and Learning 2000's complaint against Liafail and its principals and/ or Learning 2000's claims relating thereto."

On November 2, 2001, L2K and Liafail stipulated that "they will preserve all documents, data compilations and tangible things that are in their possession, custody or control, which are relevant or could lead to the discovery of relevant information concerning each party's claims in the above-captioned lawsuit." On November 20, 2001, L2K served requests for production of documents directed to Liafail. The requests sought, among other things:

(1) all documents concerning Liafail's marketing, [*4] sale, or distribution of the Lifetime Library;

(2) all documents concerning any marketing and sales materials provided by Liafail or representatives involved in the sale or marketing of the Lifetime Library or Learning 2000 Lifetime Library;

(3) all documents concerning all work product produced by Liafail's representatives engaged in the marketing, sale, and distribution of the Lifetime Library; and

(4) all demonstration, sales, and marketing materials for the Lifetime Library used and/ or created by Liafail, its agents, employees or representatives.

The requests further asked Liafail to identify and describe "any document requested herein [that] was formerly in your possession, custody or control and has been lost or destroyed or otherwise disposed of ...."

In response to these requests, Sborov gave Liafail the L2K-issued laptop that he had been using while gaining knowledge of the day-to-day operations of L2K, both as its sales representative and as its national sales manager. Upon receiving the laptop, L2K alleges that Liafail's Vice-President, Keith Hanson ("Hanson")

purged all the files from the computer. L2K further alleges that Liafail made no effort to preserve the [*5] Sborov files by copying them onto another hard drive, disk or other medium before their destruction.

L2K was able to reconstruct some, but not all, of the Sborov files. L2K maintains that, as far as can be ascertained, virtually all of the Sborov Files were relevant to the issues in this litigation. Indeed, L2K argues that, not only were they relevant, the documents were highly incriminating. For example, according to L2K, the documents included an e-mail received by Sborov, and forwarded to Stucki, which established that, in July 2001, Liafail sales representatives were promoting the Lifetime Library by using L2K marketing materials. L2K also points to an e-mail which it claims establishes that, two months later, Liafail sales representatives were still promoting the Lifetime Library by using a demonstration CD that had "Learning 2000 [] splashed all over" it. The e-mail also implicated Stucki's knowledge of these actions. L2K maintains that, to date, Liafail has denied that the conduct evidenced by these e-mails occurred. Alternatively, Liafail denies that it had any notice that its sales representatives engaged in the conduct described in these e-mails.

One week before the close [*6] of discovery, L2K alleges that it discovered additional spoliation during Frank Stucki's ("Stucki") deposition. At his deposition, Stucki testified that he "trashed two laptops in the last seven months." Specifically, he testified that he dropped the first laptop when he was staying at somebody's house in Arizona. The second laptop "slipped out of [his] hands" at home. During his deposition, he maintained that the information on both laptops was destroyed.

With respect to the first laptop ("the 1700 laptop"), Stucki initially testified that "there was nothing on there that-regarding this litigation ...." Later, he contradicted his claim of irrelevance by testifying that whatever was on that laptop was made available to litigation counsel before he disposed of it. L2K now maintains that Liafail's counsel has not confirmed that the files from the 1700 laptop were in fact searched and produced. Nor has it clarified whether (1) it made an independent judgment as to whether the documents on the 1700 laptop were responsive, or (2) whether it simply relied on Stucki's layperson's view of what he believed to be discoverable.

With respect to the second laptop ("the 1720 laptop"), Stucki [*7] was unable to confirm that everything on that laptop was made available to his counsel before it was destroyed. Liafail's counsel itself refused to confirm whether it had, in fact, searched the files on the laptop and whether responsive documents were produced or identified on a privilege log.

In response, Liafail now contends that L2K "already has in its possession the documents at issue in the instant motion." Specifically, Liafail has submitted affidavits to the effect that all of the relevant information was removed from the laptop computers, saved, and then made available to L2K.

## III. DISCUSSION

### A. The Disputed Files

L2K contends that, in the past, Liafail has maintained that the information L2K now seeks was inadvertently destroyed and is no longer available for production. In response to the present motion, however, Liafail has brought forth affidavits, albeit of questionable validity given its previous assurances that the information no longer exists, that the information does indeed exist and is available for production. *See* Liafail's Answer Brief at 4-5. Liafail even goes so far as to indicate, without any citations to record evidence to support its claims, [*8] that the files "where relevant and appropriate" have been produced to L2K. *See id.* at 2-4 (stating that all relevant information from the Sborov laptop had been produced and that backup files of this information exist). Liafail's current position on the whereabouts of the discovery sought indicates that Liafail may have engaged in questionable discovery tactics. Nevertheless, because on the record before the court, it is unclear what has been produced, and what must still be produced, the court will not immediately sanction Liafail. Rather, it will first afford Liafail the opportunity to correct or clarify the discovery record by producing the requested documents which it has claimed are available, or by producing the Bates Numbers of documents which it claims it has already produced. n1

n1 This order includes the production of all relevant documents within the meaning of *Federal Rule of Evidence 401*, including those which Liafail has conceded it did not produce due to "marginal relevance." *See* Liafail's Answer Brief at 7, n.6. The order further includes information which Liafail believes L2K already has in its possession due to its own computer file restoration efforts. *See e.g. Land Ocean Logistics, Inc. v. Aqua Gulf Corp., 181 F.R.D. 229, 240 (W.D.N.Y. 1998)* (holding that the defendants "must produce requested documents ... regardless of whether Plaintiff is also in possession of the documents.").

[*9]

### B. Sanctions

For the following reasons, should Liafail chose not to heed the court's order and produce the documents of which it claims to have possession, the court will order sanctions against it in the form of an adverse inference jury instruction.

Where the nature of the alleged breach of a discovery obligation is the non-production of evidence, the court has broad discretion in fashioning an appropriate sanction. *See Residential Funding Corp. v. Degeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002)*. In exercising its discretion, the court may impose an adverse inference instruction where: (1) the party having control over the evidence had an obligation to timely produce it; (2) the party had a "culpable state of mind;" and (3) the missing evidence is "relevant" such that a reasonable trier of fact could find that it would support the other party's claim or defense. *See id.* Liafail has not argued that the discovery at issue was, or is, out of its control, nor that it did not have an obligation to timely produce it. Thus, the court concludes that the first prong of the test has been met. It will now address the remaining two prongs.

With regard to the [*10] culpability prong, the court finds that, should Liafail disregard this order, it will have acted in bad faith. Specifically, if Liafail does not produce the requested files, it will then be in the position of having intentionally misrepresented the availability of the evidence before the court on this motion.

Further informing the court's decision on this point are the clear discrepancies in Liafail's two versions of the events, which tend to demonstrate bad faith on its part. For example, in his present affidavit, Stucki testified that attempts were made to save the contents of the 1700 laptop, and that, indeed, the contents were saved. *See* Stucki Affidavit at P 4. During his earlier deposition, however, Stucki testified that the contents of the 1700 laptop were "destroyed," and that no attempts were made to retrieve the documents from that laptop. *See* Stucki Deposition at 1366.

Additionally, Stucki's affidavit claims that the entire contents of the 1720 laptop were transferred to the old 1700 laptop and that "the transfer was successful and ... no documents or filed were omitted from the transfer and none were deleted." Stucki Affidavit at P 6. Stucki further states in [*11] his affidavit that, "I have reviewed the contents of the 1700 laptop I now use and have confirmed that all potentially relevant information which was contained on it ... has been made available to my counsel." *Id.* at P 8. The court finds it difficult to reconcile this statement with Liafail's counsel's earlier representation that both laptops were discarded because they could not be repaired. *See* June 20, 2002 Letter from W. Bruce Baird to Sean K. Hornbeck (stating that the Stucki

**A229**

2002 U.S. Dist. LEXIS 24803, *

computers "were not repairable [and] they were disposed of long ago.").

Finally, the court is satisfied that the requested discovery documents are relevant, such that a "reasonable trier of fact could infer that 'the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction.'" *Residential Funding Corp., 306 F.3d at 109.* Liafail has put Stucki's scienter at issue in this litigation by denying that he had knowledge of certain events. Accordingly, the identity of the documents he had stored on his laptops may be probabtive of what he knew or should have known.

With regard to the relevance of the Sborov files, L2K has represented [*12] that, based on the information it was able to salvage, the files were relevant to the issues in this litigation. By way of example, L2K has provided an e-mail received by Sborov, and forwarded by Stucki, which allegedly establishes that, in July 2001, Liafail sales representatives were promoting the Lifetime Library by using L2K marketing materials. *See* Liafail's Opening Brief, Ex. K.

Additionally, the court notes that a jury would be permitted to infer that Liafail's bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party. *See Residential Funding Corp., 306 F.3d at 109.* Accordingly, the court finds that the requisite relevance factor has been satisfied.

## IV. CONCLUSION

Thus, while it would be entirely appropriate for the court to sanction Liafail immediately based on the conflicting stories Liafail has espoused in an apparent attempt to perform an end-run around both L2K's discovery requests and the current motion, the court nevertheless concludes that the more just route is to allow Liafail

to correct its apparent wrongs before imposing sanctions. [*13] n2

    n2 In light of counsel's joint request for additional time to respond to the motions in limine, and the need to move the trial to a later date as a result of this request, the court finds this solution to be imminently fair to both parties.

For the aforementioned reasons, IT IS HEREBY ORDERED that:

    1. L2K's Motion for Relief from Spoliation of Evidence (D.I. 260) is GRANTED as follows:

    2. Liafail shall produce any and all relevant documents, files, or the like, originating from the Sborov laptop, as well as the 1700 and 1720 laptops, within thirty (30) days of the date of this order.

    3. Should Liafail not comply with this order, the court will order sanctions against it in the form of an adverse inference jury instruction.

    4. L2K's requests for costs as a result of Liafail's alleged misconduct is DENIED at this time.

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

Dated: December 23, 2002

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT 29

**Fully
Redacted**

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT 30

SHEET 1

**1**

```
1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                           - - -

4    GLAXO GROUP LIMITED,               :     CIVIL ACTION

5              Plaintiff,               :

6         v.                           :

7    TEVA PHARMACEUTICALS USA, INC.    :
     and TEVA PHARMACEUTICALS
8    INDUSTRIES LIMITED,               :     NO. 04-171 (KAJ)

9              Defendants.             :

                            - - -
10                     Wilmington, Delaware
            Thursday, June 30, 2005 at 11:30 a.m.
11                   TELEPHONE CONFERENCE

12                          - - -

13

14   BEFORE:   HONORABLE KENT A. JORDAN, U.S.D.C.J.

15   APPEARANCES:

16   CONNOLLY BOVE LODGE & HUTZ, LLP
17     BY:  FRANCIS DiGIOVANNI, ESQ.

18            -and-

19   MORGAN LEWIS & BOCKIUS, LLP
       BY:  BRIAN F. MURPHY, ESQ.,
20          JASON LIEF, ESQ., and
            THOMAS J. PUPPA, ESQ.
21          (New York, New York)

22              Counsel for Glaxo Group Limited

23

24

25                        Brian P. Gaffigan
                          Official Court Reporter
```

**2**

```
1    APPEARANCES (Continued):

2

3    YOUNG CONAWAY STARGATT & TAYLOR, LLP
       BY:  KAREN E. KELLER, ESQ.
4
              -and-
5
     MERCHANT & GOULD
6      BY:  MARK D. SCHUMAN, ESQ., and
            JOHN M. BERNS, ESQ.
7           (Minneapolis, Minnesota)

8              Counsel for Teva Pharmaceuticals USA,
               Inc. and Teva Pharmaceuticals
9              Industries, LTD.

10

11                      - oOo -

12            P R O C E E D I N G S

13        (Telephone conference began at 11:30 a.m.)

14        THE COURT:  Hi, this is Judge Jordan.  Who do I
15   have on the line?

16        THE TELEPHONE OPERATOR:  I'm sorry?

17        THE COURT:  I said this is Judge Jordan.  Who do
18   I have the on the line, please?

19        THE TELEPHONE OPERATOR:  Just a moment.  I'm
20   going to bring you in the conference.

21        Excuse me.  This is the operator.  I'm joining
22   Judge Jordan to the conference call.

23        THE COURT:  Good morning.  I need to know who is
24   on the line.  Please identify yourself and who you represent
25   for the record.
```

**3**

```
1        MR. DiGIOVANNI:  Your Honor, Frank DiGiovanni
2    from Connolly Bove, local counsel for plaintiff Glaxo.  Also
3    on the line is Brian Murphy who can introduce himself.
4        MR. MURPHY:  Good morning, Your Honor.  This is
5    Brian Murphy from Morgan Lewis & Bockius on behalf of the
6    plaintiff Glaxo.  With me also is Jason Lief and Tom Puppa.
7        THE COURT:  All right.  Good morning.
8        For the defense?
9        MS. KELLER:  Good morning, Your Honor.  This is
10   Karen Keller from Young Conaway on behalf of Teva.  I also
11   have with me on the phone Mark Schuman from Merchant & Gould
12   and John Berns is with him and Isabella Polsky (phonetic)
13   from Teva.
14        THE COURT:  All right.  Good morning.
15        MR. SCHUMAN:  Good morning, Your Honor.
16        THE COURT:  I have the letters from counsel
17   related to the dispute that brings us here this morning.
18   Actually, it looks like broadly speaking three categories of
19   dispute.
20        And I'm puzzled by the first one which is a
21   retread of something that we did months ago.  On the one
22   hand, I have the plaintiff saying, "hey, we had an agreement
23   and they were supposed to memorialize it" and, on the other
24   hand, I have the defendants saying, "we did memorialize it.
25   They just don't like our answer."
```

**4**

```
1        Now, I've read what you guys sent to me so I
2    don't need to you repeat what you said.  But this is the
3    question I have for the plaintiffs.  I went back and I
4    read the transcript again and I said, at the request of
5    Mr. Murphy, "will you give something in writing which
6    memorializes the statement on the matter that we're talking
7    about here, the one matter in dispute, that is, this
8    substitution of ethanol for propylene glycol, if I've got it
9    straight?"  And the response, well, the specific thing Mr.
10   Murphy asked for, "we want that formalized in a stip or an
11   answer," meaning an answer referring back to contention
12   interrogatory number six.  And they said "fine."  So the
13   defense says "we did that."  So you wanted something in
14   writing and you had agreed that contention interrogatory
15   number six being answered ought to do it.
16        What is your issue, Mr. Murphy?
17        MR. MURPHY:  Yes, Your Honor.  The issue we
18   have is simply that it's not an evidentiary, it's not for
19   evidentiary admission in order to complete the agreement,
20   which was to avoid all discovery on all of the claim
21   elements except for the so-called ethanol limitation.  And I
22   think there is an agreement in spirit.  I think it's a
23   question of process.
24        THE COURT:  Well, let's cut through the process
25   then.
```

EXHIBIT

30

SHEET 3

**9**

1  people and e-mails and we told them to please go talk to
2  those people so we can get it. We don't have it.
3        THE COURT: Okay. I think I got your position.
4  Mr. Schuman.
5        MR. SCHUMAN: Yes, I think there are a few
6  things to be added to this. First of all, the first
7  deposition that Glaxo took in this case is one of the people
8  from Novopharm who we brought down to Philadelphia for
9  deposition. His name was Tamas Szederkenyi. And I may get
10  this wrong. S-z-e-d-e-r-k-e-n-y-i. He has been involved in
11  the project since the late 90s and what he testified to is
12  that there were two divisions separated -- one was in Quebec
13  and one was I think in Toronto, but they were separated by
14  distance, two divisions of Novopharm that worked on this.
15  And the bulk of the work was done in a division, I believe
16  it was in Quebec.
17        Regardless of where it was located, that
18  division has been or was acquired by another company in
19  Canada and has been not part of Novopharm for many years.
20  We have been trying to get documents. We have very
21  sketching documents frankly in Canada and in the United
22  States for Teva.
23        THE COURT: Well, let me stop you because the
24  tenor of your remarks leads me to conclude that you are not
25  disagreeing with the plaintiff that these documents are

**10**

1  relevant to issues in the case. Do I understand that
2  correctly?
3        MR. SCHUMAN: Yes, and we've already produced a
4  lot of these ethanol tests that they've been able to read
5  and then ask for additional documents. For instance, there
6  are 15 formulations that we have given them that were these
7  precursor formulations but we can't get the base documents.
8  We've been trying to do that.
9        THE COURT: Well, tell me why you can't get
10  them.
11        MR. SCHUMAN: Well, first of all, we don't
12  have the documents in-house. We have been looking for the
13  documents in-house in locations. We've done the electronic
14  sweep. We've done that all. We've looked in Teva.
15        Now, the one anomaly I will say is the
16  preformulation memo. It comes up, it looks like it should
17  be around but we can't find a copy of it and we're still
18  looking for it. But the other ones, it doesn't surprise me
19  because most of that work was done for a division that was
20  sold off and is now a separate company.
21        THE COURT: Has there been any effort to acquire
22  those documents from the sister company by either you or by
23  Glaxo that you are aware of, Mr. Schuman?
24        MR. SCHUMAN: I asked that we start doing that
25  when this dispute came to a head this week, so prior to this

**11**

1  week, no. But we're starting to do that now. But I don't
2  believe Glaxo has tried to do that either.
3        MR. MURPHY: Your Honor, that is because until
4  this very moment, I had no knowledge or information that
5  there was any entity other than Teva that had control of
6  these documents. This is the very first time it's ever been
7  mentioned to me.
8        THE COURT: Okay. This is another example of
9  Heisenberg's Uncertainty Principle in operation. The
10  lawyers' behavior changes under observation. So you guys
11  need to talk to each other, please.
12        It seems pretty clear that this is not at least
13  at this juncture is not a legal dispute, this is a dispute
14  about whether good faith efforts have and are continuing to
15  take place to obtain concededly relevant documents, and you
16  folks need to get on the seem page and talk to each other
17  about how to make that happen. And I expect just exactly
18  that. discussion and good faith efforts to make stuff
19  happen. So there is really nothing for me to rule on right
20  now and I'm not going to rule on it except to tell you what
21  I have just said; okay?
22        MR. SCHUMAN: Yes, Your Honor.
23        THE COURT: Last but not least is the so-called
24  nonparty evidence which the folks at Teva tell me was never
25  surfaced before the letter that Glaxo sent to me and they

**12**

1  assert that this is not ripe, and I guess I'll give you a
2  shot, Mr. Murphy to tell me why you think I ought to be
3  addressing this now.
4        MR. MURPHY: Yes, Your Honor. Two comments. We
5  did produce the documents, all the documents we intend to
6  rely on in the last two weeks but I also take from their
7  letter that I guess is in accordance with kind of your
8  instruction to us to start talking to each other, they'd
9  like us to give them specific designations of testimony
10  and give them three weeks to object and then see what the
11  issues are, and that makes sense to me.
12        THE COURT: Okay.
13        MR. MURPHY: I'm happy to proceed that way.
14        THE COURT: Good. Then we're done. You guys
15  see what you can work out. And if you can't work it out,
16  you know how to get ahold of me and we'll get it hammered
17  out.
18        Okay. I think that takes care of the issues we
19  had teed up for today. But Mr. Murphy, I'll ask you first,
20  is there anything else we need to address while we're all on
21  the line together?
22        MR. MURPHY: No, judge. Only to note that
23  we're running short on time to resolve these issues. And so
24  we will try. We would ask for cooperation to do this as
25  quickly as possible so we don't run into the discovery

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT 31

1

1      IN THE UNITED STATES DISTRICT COURT

2      IN AND FOR THE DISTRICT OF DELAWARE

3                    - - -

4  GLAXO GROUP LIMITED,          :     CIVIL ACTION
                                 :
5           Plaintiff,           :
                                 :
6           v.                   :
                                 :
7  TEVA PHARMACEUTICALS USA, INC. :
   and TEVA PHARMACEUTICALS      :
8  INDUSTRIES LIMITED,           :
                                 :
9           Defendants.          :     NO. 04-171 (KAJ)

10                   - - -

11                      Wilmington, Delaware
                   Friday, October 7, 2006 at 9:30 a.m.
12                      TELEPHONE CONFERENCE

13

                         - - -
14
   BEFORE:    HONORABLE KENT A. JORDAN, U.S.D.C.J.
15
                         - - -
16  APPEARANCES:

17

        CONNOLLY BOVE LODGE & HUTZ, LLP
18      BY:  FRANCIS DiGIOVANNI, ESQ.

19         -and-

20      MORGAN LEWIS & BOCKIUS, LLP
        BY:  BRIAN P. MURPHY, ESQ., and
21           THOMAS J. PUPPA, ESQ.
             (New York, New York)
22
                   Counsel for Glaxo Group Limited
23

24
                             Brian P. Gaffigan
25                           Official Court Reporter

EXHIBIT

31

A236

REDACTED VERSION – PUBLICLY FILED

11

1          MR. SCHUMAN:  Sure, judge.  I'll try to cover.

2     If I cover the topics you didn't anticipate me covering, let

3     me know and I'll move to something else.  But when I tried

4     to go through the letter, starting with 1(a), which is the

5     documents produced, very interestingly, we had made a very

6     good document production and we made it very early in this

7     case.  There is a complaint, for instance, here on page two

8     of the letter.  They want the files and documents under --

9     to do with the chief formulator.

10          THE COURT:  I'm sorry.  You are going to have to

11     get closer to your speakerphone or something because you are

12     cutting out.

13          MR. SCHUMAN:  For instance, they asked for the

14     files and documents of Subrata Mazumder.  At that time, that

15     was under page two of the letter, Item No. 3 at the top of

16     the page.  We have been telling them for a long time that

17     we've looked for those files and that they don't exist.

18     Mr. Subrata Mazumder, when he did his notes, he put them in

19     the common file, the notes had been produced, and there is a

20     letter which is attached to our letter to the Court dated

21     June 27th that says that in very clear terms.  And I don't

22     understand why I need to repeat over and over again.  This

23     is a theme you are going to hear from me, over and over

24     again, that we have done these things, that they either

25     don't exist or we don't have them and we continue to get

12

1  these letters to the Court berating us for not doing things.

2           THE COURT:  Okay.  How about --

3           MR. SCHUMAN:  For instance -- I'm sorry, Your

4  Honor.

5           THE COURT:  Well, the assertion then you're

6  making is that you folks, you have nothing to share on the

7  development of the formulation of the ranitidine -- if I'm

8  saying that name right -- hydrochloride oral syrup.  You

9  have given all you've got to give and there is no more.

10          MR. SCHUMAN:  We continue to dig.  And, for

11  instance, we just sent some e-mails that we found going

12  through personal computers.  And in there, for instance,

13  they weren't the type of documents that are going to give

14  you a "Clarence Darrow" moment.  They were like, "I want to

15  have a meeting at 10 o'clock.  Can you make it?"  And the

16  other guy says, "No, I can't do it that type of thing."  So

17  we've been digging very deep to get these things.

18          THE COURT:  Well, where are they?  That is the

19  question that must be frustrating Mr. Murphy & Co.  You

20  know, somebody someplace came up with what you folks think

21  is a noninfringing excellent cough medication, and it didn't

22  spring into existence all by itself.  It's not flowing from

23  a rock some place.

24          MR. SCHUMAN:  Right.

25          THE COURT:  Somebody formulated this --

**A238**

1              MR. SCHUMAN:  Right.

2              THE COURT:  I confess to being a little wet

3      behind the ears, but usually in these cases somebody has

4      notes about what they did to develop it.  So where is

5      it?

6              MR. SCHUMAN:  And we have given them.  For

7      instance, Item No. 2 on page two, Your Honor, he wants all

8      these batch numbers.  I'm going to give you some batch

9      numbers that starts with 3G-0431.  We produced documents

10     T1890 through 1898 which are the stability testing, et

11     cetera, for that batch.

12             For batch number 1853-005, it says document

13     production is replete with those.  I pulled out a few

14     samples this morning, T1535 through T1577.

15             I can go on and on, judge.

16             THE COURT:  Well --

17             MR. SCHUMAN:  We did produce documents but the

18     problem you may recall that gets us into the Pharmascience

19     area is that the development for this drug was done by

20     another division of Novopharm called Novopharm Quebec which

21     was spun off in, if my memory is correct, the late 90s to a

22     company called Tangeo, which is now Pharmascience, and we

23     have attempted to get those documents.  After the June call

24     with Your Honor, we made repeated phone calls and we sent a

25     letter to them trying to get two letters to them trying to

14

1    get those documents.  We informed Glaxo we could not get

2    them and asked them to serve process under the Hague

3    Convention.  We did not oppose that, either here or in

4    Canada, and they have done that.  They served the Hague

5    Convention documents.  That has been opposed by Pharma-

6    science in Canada based upon a Business Records Act up

7    there that apparently precludes.

8            THE COURT:  Okay.  Yes, let me stop you because

9    I read the letters.  I understand, nobody is disagreeing

10   that Pharmascience is being less than cooperative in turning

11   information over.  So I'm taking it as a given for sake of

12   discussion -- just a moment.

13           (Pause.)

14           THE COURT:  Excuse me.  I'm taking it as a

15   given for purposes of discussion that Mr. Murphy & Co. don't

16   want to wait a year to see how that plays out and that

17   Pharmascience isn't going to see the light and decide they

18   ought to be cooperative.  And I'm going to assume that you

19   have done everything you can, Teva, to extract that

20   information.  You've pushed them.  You've prodded them.

21   You've used your business influence with them, et cetera.

22           MR. SCHUMAN:  Yes.

23           THE COURT:  I'll take that as a given for

24   purposes of this discussion.  I'm just trying to get to the

25   nub of this issue.  Is what you are telling this court, that

**A240**

15

1    you have no development documents you can give, nor any

2    access to them?  Because if that is what you are saying, I

3    want to hear it.

4                   MR. SCHUMAN:  We do, and we have given those,

5    judge.  We have limited documents on the thing because there

6    is always intercompany correspondence back and forth.  We

7    have given what we have.

8                   THE COURT:  So you got nothing else to give?

9                   MR. SCHUMAN:  We have nothing else to give.

10                  THE COURT:  Okay.  Then I hand the ball to you,

11   Mr. Murphy.  I'm getting an affirmation from an Officer of

12   the Court that there is nothing further that they have under

13   their control or within their possession that they can give,

14   so that being upset about it won't help.  The question is

15   what do you do next?

16                  MR. SCHUMAN:  Judge, I have to qualify that with

17   two things.  We have recent stability studies, 24-month

18   stability studies that just came out that have been asked

19   for this month that we're getting and going to produce and

20   there is 18-month stability as well but those are the two

21   things that I'm aware of.  Everything else has been

22   produced.

23                  THE COURT:  And when are you going to produce

24   those?

25                  MR. SCHUMAN:  We're hoping to do it this week --

**A241**

1    judge and one who is prepared, in the context of this case,

2    where the documents evidently are just not to be had, to

3    have extremely limited patience with the position that not

4    only do you not get documents, you don't get to ask about

5    it.

6            Am I communicating effectively the feel I've got

7    for the way this deposition ought to proceed and ought not

8    to proceed, I hope?  Mr. Schuman?

9            MR. SCHUMAN:  Yes, Your Honor.  Very clearly.

10           THE COURT:  Okay.  Thanks.

11           All right.  So although I'm not saying designate

12   by Tuesday, I am saying you need to move forward and get

13   that done with relative dispatch, if you would.

14           All right.  Now, I think we've handled the 1(a)

15   and frankly we've handled the 1(b) because as to the

16   "Pharmascience," excuse me, as Glaxo labels it, sounds like

17   a pretty good excuse to me.  Pharmascience isn't owned,

18   operated by or controlled by Teva.  If they want to stand

19   on their rights under Canadian law, I'm not sure what it is

20   you want me to do in that regard, Mr. Murphy.  You've got a

21   third party and they're doing what they're doing, so are

22   you, pursuing what you are pursuing.  I don't know if there

23   is anything else to say about that except, perhaps, to raise

24   the question of how the deposition testimony from Glaxo vs.

25   Pharmadyne might work in here.

24

1          What are the positions of the parties here?

2     Because if there is information that isn't being provided

3     and was somehow available in another context, that's

4     something I'm going to be interested in hearing about.

5     Mr. Murphy, do these issues relate to each other at all or

6     is that just a misstep by me to think they might?

7          MR. MURPHY:  Well, Your Honor, I'm not sure

8     they're linked.  Let me address Pharmascience.  Given

9     counsel's representations, I agree with you, there is

10    nothing more we can ask of Teva and we won't.  We'll pursue

11    it if the client chooses to expend the resources to make a

12    constitutional challenge to a Canadian statute, which I

13    think is highly unlikely.

14         On Pharmadyne, we've attempted to locate the

15    current whereabouts of the witnesses and we're basically

16    considering what, if anything, we can or should do to try to

17    preserve testimony or make an evidentiary record for this

18    case, based on what they testified to under oath in the

19    previous case which may be relevant.  We just haven't

20    finally decided what to do yet.  Teva has objected to all of

21    that testimony entirely and indicated that they will object

22    if it is offered into evidence at trial or I guess on the

23    summary judgment motion.

24         THE COURT:  Well, it's evidence as to what?

25         MR. MURPHY:  The stabilizing effect of propylene

**A243**

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT 32

REDACTED VERSION – PUBLICLY FILED

Page 1



LEXSEE 2006 U.S. DIST. LEXIS 11972

**DINO G. PETROCELLI, Plaintiff, v. DAIMLERCHRYSLER CORPORATION, Defendant.**

**Civil Action No. 04-943-KAJ**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2006 U.S. Dist. LEXIS 11972*

**March 22, 2006, Decided**

**PRIOR HISTORY:** *Petrocelli v. DaimlerChrysler Corp., 2005 U.S. Dist. LEXIS 39051 (D. Del., Sept. 28, 2005)*

**COUNSEL:** **[*1]** Dino G. Petrocelli, Plaintiff, Pro se.

Jennifer Gimler Brady, Esq., Sarah E. DiLuzio, Esq., Potter Anderson & Corroon LLP, Wilmington, Delaware, for Defendant. Of Counsel: William C. Martucci, Esq., Kristen Aggeler Page, Esq., Shook Hardy & Bacon LLP, Kansas City, Missouri.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Kent A. Jordan

**OPINION:**

**MEMORANDUM OPINION**

March 22, 2006
Wilmington, Delaware

**JORDAN, District Judge**

**I. INTRODUCTION**

This is an employment discrimination case brought by Dino G. Petrocelli ("Petrocelli"), who is proceeding pro se, against his former employer, DaimlerChrysler Corporation ("DaimlerChrysler" or the "Company"). Petrocelli, a Hispanic American, claims that while he was working for DaimlerChrysler he was the target of discrimination based on his national origin, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), *42 U.S.C. § § 2000e et seq.*, and of the Delaware Discrimination in Employment Act (the "Delaware Act"), *19 Del. Code § 711.* He also alleges that, in violation of Title VII, DaimlerChrysler retaliated against him for filing the first **[*2]** of two charges of discrimination and that the Company defamed him by accusing him of theft and by making derogatory statements about his work habits. Before me now is DaimlerChrysler's Motion for Summary Judgment. (Docket Item ["D.I."] 56; the "Motion".) This court has subject matter jurisdiction over the case pursuant to *28 U.S.C. § § 1331, 1343,* and *1367.* For the reasons that follow, the Motion will be granted in part and denied in part.

**II. BACKGROUND** n1

n1 The following background information is taken from the parties' submissions and does not constitute findings of fact.

A. *Perceived Harassment During Petrocelli's Employment at DaimlerChrysler*

Petrocelli applied for employment with DaimlerChrysler on March 15, 1997 (D.I. 58 at A1-2), after being referred to the Company through the Latin American Community Center (*id.* at A8, 66:21-67:14). On his application, Petrocelli listed "Spanish" as one of his skills (*id.* at A1), and during his interview with DaimlerChrysler, **[*3]** he was asked to "say a few things in Spanish," because he "didn't look Hispanic" (*id.* at A9-10, 73:24-74:8, 74:23-75:3). In May 1997, Petrocelli began working at DaimlerChrysler's Parts Distribution Center in Newark, Delaware ("Newark PDC"). (*Id.* at A11, 81:2-4.) Petrocelli worked on the night shift at Newark PDC, initially on the dock and later in the warehouse as a picker/packer. (*Id.* at A10-11, 77:12-78:10.)

Petrocelli testified at his deposition about several incidents at Newark PDC that he perceived to be harassment based on his national origin. First, he testified that his coworkers drew pictures of his "face with a beard . . . and [his] name under there and saying, 'Me no speak English' . . . [with] a sombrero . . . or a jail cell with a sombrero with [his] name." (*Id.* at A23, 140:7-11.) Those

**A244**

pictures were drawn with markers "in the bathrooms, on the work equipment, [and] out in the work area on boxes." (*Id.* at A23, 140:12-18.) One particular picture, drawn in the bathroom in October 2001, depicted "a snake with a sombrero, [Petrocelli's] name underneath of it, . . . bars of a jail cell around it, . . . [and] references to . . . [him] not [*4] speaking English." (*Id.* at A25, 169:21-24.) He further testified that "on several occasions," starting in January 2000, pictures and notes were left in work areas "referring to burritos and tacos . . . and references to [him] wearing a bandanna . . . being in gangs and calling [him] 'Esse'." (*Id.* at A26, 185:17-186:3.)

Petrocelli also testified that he was called "Spic" by coworkers on "numerous" occasions, including once in December 2001 in front of the control center at Newark PDC. (*Id.* at A26, 186:12-23.) Petrocelli testified that he was called "a lazy Latino," a "mushroom picker," and a "Spic" on other occasions in 1998 and 2000. (*Id.* at A34-35, 218:18-20, 220:16-221:1.) During some of those incidents, the speaker using those terms acted "like he was going to run [Petrocelli] over with his forklift." (*Id.* at A34-35, 220:23-221:1.)

According to Petrocelli, one of his supervisors saw him wearing a cross, asked if he was Catholic, and when Petrocelli said that he was, the supervisor "looked surprised . . . [and] said, 'Well, I thought you people practiced "Santaria" or Voodoo or something like that,' and laughed." (*Id.* at A31, 206:12-207:1; *see* [*5] *also id.* at A20, 121:4-17.)

Finally, Petrocelli testified that, starting in September 2001, coworkers made references about his relationship with a non-Hispanic white female coworker. (*Id.* at A26, 187:24-188:5.) Those references included sexually explicit drawings posted on billboards (*id.* at A26, 188:15-22), as well as a particular occasion where a coworker said to Petrocelli and the female coworker, "Are you down with the brown tour?" (*id.* at A26-27, 188:9-15, 189:7-14).

### B. *Events Leading Up to Petrocelli's Firing*

During his tenure at Newark PDC, which lasted from 1997 until January 2002, Petrocelli was disciplined many times for violating DaimlerChrysler's Standards of Conduct. Petrocelli's disciplinary record (*id.* at A99-119) includes, inter alia, violations for (1) leaving work during working hours without permission, or failing to return to work after lunch or relief without permission; (2) failing to exert normal work effort on the job, wasting time, loitering, loafing, or sleeping on the job; (3) failing to follow instructions from supervisors; (4) negligent or deliberate damage to DaimlerChrysler's property; and (5) threatening, intimidating, coercing, [*6] harassing, retaliating, or using abusive language to others. (*See also*

*id.* at A96-97 (DaimlerChrysler Standards of Conduct).) Between April 14, 1999 and June 14, 2001, Petrocelli received four disciplinary layoffs, each lasting between five and thirty days. (*Id.* at A100-10.) On September 19, 2001, Petrocelli was suspended for attempting to steal DaimlerChrysler property. (*Id.* at A111-14.) Finally, on January 9, 2002, Petrocelli was suspended indefinitely for violating DaimlerChrysler's standards of conduct. (*Id.* at A115-17.) That suspension was modified to a discharge effective January 11, 2002. (*Id.* at A118.)

Petrocelli testified that twelve of his coworkers committed similar violations but were not punished as severely as he was. (*Id.* at A21-23, 130:9-138:9.) Those violations included sleeping, loafing, and playing board games (*id.* at A22-23, 136:10-138:9), as well as the more severe issue of working under the influence of drugs (*id.* at A21-22, 133:11-134:23). According to Petrocelli, some coworkers received no discipline for those violations (*id.* at A22, 136:10-137:2), while others received too little discipline (*id.* at A22-23, 134:17-23, 138: [*7] 1-9). Petrocelli also admitted, however, that he did not know precisely what discipline those coworkers received, although he perceived it to be less severe than what he received. (*Id.* at A22-23, 134:20-136:4, 138:1-9.)

After he was discharged in January 2002, Petrocelli filed a union grievance to appeal that decision. (*Id.* at A152-53.) That grievance addressed whether discharge was an appropriate response to Petrocelli's violations, but it did not include any allegations of discrimination based on national origin. (*Id.*) On April 11, 2002, the Appeal Board, which included representatives of DaimlerChrysler and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), directed that Petrocelli be offered reinstatement, and that offer was extended in a letter to Petrocelli dated May 22, 2002. (*Id.* at A154-56.) The reinstatement offer required Petrocelli to report to Newark PDC on May 28, 2002. (*Id.* at A156.)

However, Petrocelli did not report as directed because, in March 2002, while his grievance was being considered, he had been arrested for possession of cocaine and he remained in custody. (*Id.* at A4, 33:2-5; [*8] *id.* at A157.) He was convicted of possession of a controlled substance and violation of probation, which had been imposed after an earlier conviction for offensive touching. (*Id.* at A5, 34:4-20, 35:24-36:15.) He was incarcerated for approximately eight months, beginning in March 2002. (*Id.* at A33, 213:22-214:3.) After failing to report by June 6, 2002, and failing to substantiate the reason for his failure, Petrocelli's seniority was terminated. (*Id.* at A158-59.)

### C. *Procedural History*

On January 22, 2002, while his grievance was pending, Petrocelli filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Delaware Department of Labor against Daimler-Chrysler, alleging that he was subjected to discrimination and a hostile work environment in violation of Title VII and the Delaware Act. (*Id.* at A160.) On November 26, 2003, the Delaware Department of Labor issued a Reasonable Cause Finding that concluded there was evidence to support a finding of a hostile work environment but not a finding that the disciplinary actions and discharge resulted from discrimination. (*Id.* at A167-68.) The EEOC adopted those findings in [*9] a Notice of Right to Sue dated May 18, 2004. (*Id.* at A169.) The EEOC also issued a Notice of Right to Sue on January 6, 2005, stating that the EEOC found reasonable cause to believe that a violation had occurred, but that it had not obtained a settlement with DaimlerChrysler and would not bring suit. (*Id.* at A161.) That notice concluded the EEOC's processing of Petrocelli's first charge of discrimination against the Company. (*Id.*)

On April 3, 2003, Petrocelli filed with the EEOC a second Charge of Discrimination, alleging that Daimler-Chrysler had retaliated against him for filing his first charge by offering him reinstatement when the Company knew that he was incarcerated and unable to report. (*Id.* at A162.) The EEOC issued a Dismissal and Notice of Right to Sue on September 10, 2003, stating that the retaliation charge could not be investigated because it was not filed within the statutory time limit. (*Id.*) That notice informed Petrocelli that he had ninety days to file a claim based on that second charge, or the right to sue would be lost. (*Id.*)

Based on the May 18, 2004 Notice of Right to Sue on the first charge of discrimination, Petrocelli filed this [*10] suit against DaimlerChrysler on August 16, 2004, alleging that he was fired, disciplined, and subjected to a hostile work environment in violation of Title VII and the Delaware Act. (*Id.* at A164-70.) On September 28, 2005, Petrocelli was granted leave to amend his complaint. (D.I. 53.) That amended complaint provided more explanation in support of Petrocelli's allegations of discrimination, as well as articulating his claims for retaliation and defamation. (D.I. 58 at A171-75.) Petrocelli seeks reinstatement, back pay, front pay, and compensatory and punitive damages. (*Id.* at A174.)

## III. STANDARD OF REVIEW

Pursuant to *Federal Rule of Civil Procedure 56(c)*, a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party

is entitled to judgment as a matter of law. In determining whether there is a triable dispute of material fact, a court must review the evidence and construe all inferences in the light most favorable [*11] to the non-moving party. *Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976).* However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).* To defeat a motion for summary judgment, *Rule 56(c)* requires that the non-moving party "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (internal citation omitted). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(c).* "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita, 475 U.S. at 587* (internal citation omitted). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*

## IV. DISCUSSION [*12]

In his complaint, Petrocelli asserts that Daimler-Chrysler violated both Title VII and the Delaware Act. (D.I. 58 at A164-70.) Since claims of employment discrimination under the Delaware Act are analyzed in the same way as claims under Title VII, *Giles v. Family Court, 411 A.2d 599, 601-02 (Del. 1980),* the following analysis uses the Title VII framework, and the conclusions apply equally to the claims of hostile work environment and disparate treatment under the Delaware Act.

### A. Hostile Work Environment

A hostile work environment may form the basis of a Title VII discrimination claim against an employer. *Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001)* (citing *Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65-68, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)).* The inquiry into whether an environment is hostile requires a look into "all the circumstances . . . [including] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).* [*13] That analysis "must concentrate not on individual incidents, but on the overall scenario." *Durham Life Ins. Co. v. Evans, 166 F.3d 139, 149 (3d Cir. 1999).* To establish a Title VII claim based upon a hostile work environment, Petrocelli must show that

"(1) he suffered intentional discrimination because of his national origin; (2) the discrimination was pervasive and regular; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability." *Cardenas, 269 F.3d at 260.*

For purposes of this Motion, DaimlerChrysler concedes four of those five elements, arguing only that the discrimination faced by Petrocelli was not pervasive and regular. (D.I. 57 at 28-32.) DaimlerChrysler first argues that the harassment discussed in Petrocelli's deposition is a series of isolated incidents. In particular, according to DaimlerChrysler, the name-calling, including epithets like "spic," "mushroom picker," "lazy Latino," and references to "you people" practicing Santaria or voodoo, were sporadic, and, in any event, constituted merely offensive utterances. [*14] *(Id.* at 29.) Also, according to DaimlerChrysler, the picture of the snake with the sombrero in a jail cell with Petrocelli's name was a one-time occurrence, and that a "single item of graffiti" is not pervasive and regular discrimination. *(Id.* at 30.)

DaimlerChrysler's argument misses the mark, because it focuses on individual incidents in isolation and, unsurprisingly, finds that each is a one-time occurrence. To the contrary, the analysis must consider the circumstances as a whole and not focus on each event individually. *Durham Life, 166 F.3d at 149.* According to Petrocelli's unrebutted testimony, he was called a "spic" on "numerous" occasions during his time at Newark PDC. (D.I. 58 at A26, 186:12-23.) Other derogatory terms, such as "lazy Latino," and "mushroom picker," were allegedly directed at him. *(Id.* at A34-35, 218:18-20, 220:16-221:1.) The reference to the religion practiced by "you people" was also clearly addressed to Petrocelli's Hispanic origin. *(Id.* at A31, 206:12-207:1.) Those statements, taken as a group and according to Petrocelli's testimony, were not sporadic, and they constitute more than offensive utterances. *See Smith v. Leggett Wire Co., 220 F.3d 752, 767 (6th Cir. 2000)* [*15] (holding that the commonplace use of the word "nigger" constituted more than mere offensive utterances). Finally, according to Petrocelli, pictures directed at his national origin were drawn in the bathrooms, on the work equipment, and out in the work area on boxes. (D.I. 58 at A23, 140:7-18; *id.* at A25, 169:21-24.) DaimlerChrysler points to one such picture and calls it an isolated occurrence. (D.I. 57 at 30.) Again, by isolating individual events, DaimlerChrysler ignores the totality of Petrocelli's allegations.

DaimlerChrysler also argues that many events that were perceived by Petrocelli to constitute harassment, including the statements and drawings referring to Petrocelli's romantic relationship with a non-Hispanic white coworker, the request that he speak Spanish at his interview, and the discipline he received for violating the standards of conduct, were not actually directed at his national origin. (D.I. 57 at 28-31.) While I agree that each of those events, viewed in isolation, might not be obviously directed at Petrocelli's Hispanic origin, n2 when they are considered along with the epithets and offensive graffiti, a reasonable jury might conclude that those acts were [*16] motivated by a discriminatory purpose. *See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996)* (interpreting less obvious incidents in light of other racially-motivated events). Therefore, the less overt incidents reported by Petrocelli are properly included in the totality of circumstances examined by the factfinder.

n2 The "brown tour" comment does seem so directed, however. *(See* D.I. 58 at A26-27, 188:9-15, 189:7-14.)

DaimlerChrysler has failed to show that, viewing the evidence in the light most favorable to Petrocelli, the incidents of hostility were not "pervasive and regular" as required under Title VII. Petrocelli's unrebutted testimony raises a genuine issue of material fact concerning the frequency and severity of the hostility he experienced. Therefore, because that is the only issue raised by DaimlerChrysler, I will deny the Motion as to the hostile work environment claim.

### B. *Disparate Treatment*

Petrocelli alleges that when DaimlerChrysler disciplined [*17] him for violating the standards of conduct and eventually fired him, it discriminated against him based on his national origin. (D.I. 58 at A165.) Those disparate treatment claims are analyzed under the *McDonnell Douglas* burden shifting framework. *Jones v. Sch. Dist. Of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999)* (referring to *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)).* Under that framework, Petrocelli must establish a prima facie case of discrimination based on national origin by showing: (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; and (3) that that action occurred under circumstances that give rise to an inference of unlawful discrimination, such as might occur when a similarly situated person not of the protected class is treated differently. *Jones, 198 F.3d at 410-11; Boykins v. Lucent Techs., Inc., 78 F. Supp.2d 402, 409 (E.D. Pa. 2000).* If Petrocelli succeeds in establishing a prima facie case, then DaimlerChrysler must "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Jones, 198 F.3d at 410.* [*18] If DaimlerChrysler meets that burden, then Petrocelli must show by a preponderance of the evidence that those legitimate reasons were a pretext for discrimi-

nation. *Id.* If DaimlerChrysler raises a legitimate nondiscriminatory reason for its actions, Petrocelli may overcome a summary judgment motion with evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).*

Here, for both the claim based on disciplinary action and the claim based on discharge, DaimlerChrysler concedes, for purposes of this Motion, the first two elements of Petrocelli's prima facie case, but argues that he has not established the third element: that the circumstances give rise to an inference of unlawful discrimination. (D.I. 57 at 21-23, 25.) Furthermore, DaimlerChrysler argues that it had legitimate nondiscriminatory reasons for disciplining and firing Petrocelli, and Petrocelli has failed to establish that those reasons were pretextual. [*19] (*Id.* at 23-25, 26-27.) The arguments concerning the inference of unlawful discrimination and the showing of pretext both focus on Petrocelli's failure to show that similarly situated coworkers were treated differently than he was. (*Id.* at 22-25, 27.)

If Petrocelli's assertions about the discipline received by his coworkers were the only relevant evidence, I would agree that Petrocelli had failed to establish an inference that his discipline and firing were based on unlawful discrimination. Petrocelli admitted that he did not know precisely what discipline other employees received (D.I. 58 at A22-23, 134:20-136:4, 138:1-9), and his unsubstantiated belief that he was punished more severely is insufficient to support his prima facie case. *See Seabrook v. Gadow, 2003 U.S. Dist. LEXIS 10096, No. CIV.A.01-802, 2003 WL 21383719, at *7 (D. Del. June 10, 2003).* Also, considering that DaimlerChrysler has articulated legitimate nondiscriminatory reasons for its actions by presenting the details of Petrocelli's disciplinary record (D.I. 58 at A99-119), Petrocelli's belief about the discipline given to other employees is insufficient to raise a genuine issue of material fact as to pretext. *See* [*20] *Seabrook, 2003 WL 21383719, at *7.*

However, for the claim based on disciplinary actions, Petrocelli has presented other relevant evidence. "Evidence of. . . a hostile work environment is relevant to whether one of the principal non-discriminatory reasons asserted by an employer for its actions was in fact a pretext for discrimination." *Aman, 85 F.3d at 1086.* As discussed above, *supra* Section IV.A, Petrocelli has presented sufficient evidence to overcome DaimlerChrysler's summary judgment motion as to his hostile work environment claim. That general evidence of a hostile environment, viewed in the light most favorable to Petrocelli, raises genuine issues of material fact both as to

open hostility at Newark PDC and as to the reasons underlying the disciplinary actions taken against Petrocelli by his supervisors. That evidence is relevant not only for Petrocelli's prima facie case of discrimination, but could also support a reasonable factfinder's belief that an invidious discriminatory reason was a motivating or determinative cause of those actions. *Fuentes, 32 F.3d at 764* Therefore, Petrocelli has presented sufficient evidence of [*21] pretext to survive a motion for summary judgment, and I will deny the Motion as to the disparate treatment claim based on the disciplinary actions taken against Petrocelli.

The evidence of a hostile work environment is not sufficient, however, to support Petrocelli's disparate treatment claim based on his discharge. DaimlerChrysler has articulated a legitimate nondiscriminatory reason for that action: Petrocelli failed to report to work after he was reinstated because he was incarcerated for possession of cocaine and violation of his probation. (D.I. 58 at A5, 34:4-20, 35:24-36:15; *id.* at A33, 213:22-214:3; *id.* at A157-59; *see also* D.I. 57 at 26.) While the evidence about the environment at Newark PDC raises a factual issue as to the motivation behind the discipline given to Petrocelli by his supervisors, a reasonable factfinder could not infer that the decision to discharge Petrocelli after he failed to report was motivated by discrimination. His failure to report was caused by his own actions in March 2002 and his subsequent arrest, conviction, and incarceration. Therefore, I will grant the Motion as to the disparate treatment claim based on Petrocelli's discharge. n3 [*22]

n3 In his claim that DaimlerChrysler retaliated against him for filing a discrimination charge, Petrocelli alleged that the Company knew that he was incarcerated and that the timing of his reinstatement was manipulated so that he would be unable to report. (D.I. 58 at A162.) As discussed below, *infra* Section IV.C, that retaliation claim is time-barred, and the allegations concerning the timing of his reinstatement were not raised in the EEOC charge which provides the basis for this suit (*id.* at A160). Thus, those allegations may not be used to support the disparate treatment claim based on his discharge. In addition, as noted below, *infra* Section IV.C, Petrocelli has adduced no evidence to support his allegation that the timing of his reinstatement was actually manipulated.

## C. Retaliation

In his amended complaint, Petrocelli alleges that DaimlerChrysler discharged him in retaliation for filing

his first Charge of Discrimination on January 22, 2002. (*Id.* at A172, (1)(c).) That allegation, [*23] made pursuant to Title VII, was first raised in a Charge of Discrimination filed by Petrocelli with the EEOC on April 3, 2003. (*Id.* at A162.) The EEOC issued a dismissal on September 10, 2003, giving Petrocelli notice that his right to sue on that charge would be lost after ninety days. (*Id.* at A163.)

DaimlerChrysler correctly points out (D.I. 57 at 33) that Petrocelli did not file his compliant until August 16, 2004 (D.I. 58 at A164-66), and so his claim of retaliation under Title VII was filed outside the ninety-day window and is therefore time-barred. *See 42 U.S.C. § 2000e-5(f)(1).* That time bar is subject to equitable tolling if the filing was untimely "due to sufficiently inequitable circumstances." *Grice v. U.S. Postal Serv.,* No. Civ.A.05-2404, 2005 WL 1528880, at *4 (D.N.J. June 29, 2005). No such circumstances have been presented here. Even though Petrocelli is proceeding pro se, he filed his complaint in a timely manner after the EEOC dismissed his disparate treatment and hostile work environment charges, and there is no apparent excuse for his failure to do so for his retaliation charge. (D.I. 58 at A164-66, A169.) [*24] Thus, I conclude that Petrocelli's retaliation claim is time-barred.

Even if that claim were not time-barred, Petrocelli has failed to demonstrate a causal link between his charge of discrimination and his discharge. *See Abramson v. William Paterson Coll. of N.J.,* 260 F.3d 265, 286 (3d Cir. 2001) (requiring such a demonstration to support a prima facie claim of retaliation). As already noted, *supra* Section IV.B, Petrocelli was discharged after failing to report to work because he was incarcerated. Petrocelli has produced no evidence to support the allegation that that decision was caused by a retaliatory motive. Therefore, in addition to being time-barred, Petrocelli has failed to establish a prima facie case of retaliation.

D. *Defamation*

Finally, in addition to his claims under Title VII and the Delaware Act, Petrocelli makes a defamation claim, apparently pursuant to Delaware common law. (D.I. 58 at A173.) In support of its Motion, DaimlerChrysler does not dispute whether Petrocelli has established a prima facie claim of defamation, but asserts that it is protected by the qualified privilege between employer and employee. (D.I. 57 at 35-36.)

DaimlerChrysler [*25] is correct that, under Delaware law, statements made in furtherance of the common interest of management and labor in operating a successful business are privileged. *Gonzales v. Avon Prods., Inc.,* 609 F. Supp. 1555, 1559 (D. Del. 1985) (citing *Battista v. Chrysler Corp.,* 454 A.2d 286, 291 (Del. Super. Ct. 1982)). The statements made about Petrocelli, including allegations of theft and loafing (D.I. 58 at A173), appear to fall within that common interest. However, the qualified privilege will be lost if the speaker knows the statement is false, or if the speaker acts with express malice, a desire to cause harm, or bad faith. *Gonzales, 609 F. Supp. at 1559.* The evidence raised by Petrocelli in support of his hostile work environment claim, when viewed in the light most favorable to him, also raises a genuine issue as to the motives behind the allegedly defamatory statements. Therefore, I will deny the Motion as to the defamation claim.

V. CONCLUSION

Accordingly, I will grant the Motion for Summary Judgment as to the disparate treatment claim based on Petrocelli's discharge and as to the retaliation claim. I will deny the [*26] Motion in all other respects. An appropriate order will follow.

ORDER

For the reasons set forth in the Memorandum Opinion issued in this matter today,

IT IS HEREBY ORDERED that the Motion for Summary Judgment is GRANTED as to the disparate treatment claim based on Plaintiff's discharge, GRANTED as to the retaliation claim, and DENIED in all other respects.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

March 22, 2006
Wilmington, Delaware

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT 33

REDACTED VERSION – PUBLICLY FILED

Page 1



LEXSEE 1993 U.S. APP. LEXIS 16128

**MICROSOFT CORPORATION, Plaintiff-Appellee, v. IQ TECHNOLOGIES, INC., Defendant-Appellant.**

92-1534

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

*1993 U.S. App. LEXIS 16128; 28 U.S.P.Q.2D (BNA) 1477*

**June 30, 1993, Decided**

**NOTICE:** [*1]    RULE 47.8. OPINIONS AND OR-DERS DESIGNATED AS UNPUBLISHED SHALL NOT BE EMPLOYED AS PRECEDENT BY THIS COURT, AND MAY NOT BE CITED BY COUNSEL, EXCEPT IN SUPPORT OF A CLAIM OF RES JUDI-CATA, COLLATERAL ESTOPPEL, OR LAW OF THE CASE. ANY PERSON MAY REQUEST THAT AN UNPUBLISHED OPINION OR ORDER BE REPRE-PARED AND REISSUED FOR PUBLICATION, CIT-ING REASONS THEREFOR. SUCH REQUEST WILL BE GRANTED OR DENIED BY THE PANEL THAT RENDERED THE DECISION.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: *1 F.3d 1253, 1993 U.S. App. LEXIS 27910.*

**PRIOR HISTORY:** Appeal from the United States Dis-trict Court for the Western District of Washington. No. C91-941D.

**DISPOSITION:** Accordingly the grant of summary judgment by the district court is affirmed.

**JUDGES:** Before ARCHER, Circuit Judge, COWEN, Senior Circuit Judge, and MICHEL, Circuit Judge.

**OPINIONBY:** ARCHER

**OPINION:** ARCHER, Circuit Judge.

DECISION

IQ Technologies, Inc. appeals from the June 5, 1992 order of the United States District Court for the Western District of Washington, No. C91-941D, granting Micro-soft Corp. summary judgment of noninfringement. We affirm.

DISCUSSION

A. Microsoft brought the appealed from action seek-ing a declaratory judgment that its "mouse" device did not infringe any claims of United States Patent No. 4,631,698 (the '698 patent) to J.F. Walsh and W.P. Dean, entitled [*2] "Interface Apparatus," and assigned to IQ Technologies. IQ Technologies denied Microsoft's allegation of noninfringement and counterclaimed for, inter alia, direct and active inducement of infringement of the '698 patent. Microsoft moved for summary judg-ment of noninfringement of the '698 patent. IQ Tech-nologies defended the summary judgment motion argu-ing that the mouse literally and equivalently infringes independent claims 22, 23, and 28 of the '698 patent. The district court granted Microsoft's motion for summary judgment of noninfringement of the '698 patent, holding that no genuine issue of fact precluded a legal determina-tion that contested claims 22, 23, and 28 were not in-fringed. IQ Technologies appeals.

B. Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the mov-ing party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining the propriety of summary judgment, credibility determinations may not be made, and the evidence must be viewed favorably to the nonmovant, with doubts resolved and reasonable inferences drawn in its favor. *SRI Int'l v. Matsushita Elec. Corp.,* 775 F.2d 1107, 1116, 227 USPQ 577, 581-82 (Fed. Cir. 1985) [*3] (in banc). We review de novo the grant of summary judgment.

Determining whether a patent is infringed involves two inquiries: (1) interpreting the claims; and (2) com-paring the properly interpreted claims to the accused device. *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 821, 23 USPQ2d 1426, 1431 (Fed. Cir. 1992). Claims are construed as a matter of law by the district court, and the construction given the claims is reviewed de novo by this court on appeal. See *id.* at 822-23, 23 USPQ2d at 1432. The comparison of the properly construed claims, the

1993 U.S. App. LEXIS 16128, *; 28 U.S.P.Q.2D (BNA) 1477

ultimate question of infringement, is a matter of fact. *Lemelson v. United States, 752 F.2d 1538, 1547, 224 USPQ 526, 530 (Fed. Cir. 1985).* The patentee bears the burden of proving infringement. Thus, an accused infringer "is entitled to summary judgment, on the ground of non-infringement, by pointing out that the patentee failed to put forth evidence to support a finding that a limitation of the asserted claim was met by the structure in the accused devices." *Johnston v. IVAC Corp., 885 F.2d 1574, 1578, 12 USPQ2d 1382, 1384 (Fed. Cir. 1989).* [*4]

C. The district court held that the accused internal circuitry of Microsoft's mouse failed to meet, inter alia, the "connector means" limitations of claims 22, 23, and 28. n1 Based on the language of the claims and specification, and testimony of IQ Technologies' witnesses, the district court construed "connector means" as used in the claims to mean "components, either male or female, which mate with like components of the opposite gender in order to (1) provide an electrical connection and (2) allow the user to quickly attach and remove the interface apparatus." Order at 11-12.

n1 Claim 28, representative of the asserted claims, provides:

An interface apparatus for interconnecting computers and peripheral devices with external connectors having open inputs on handshake or control signal lines, comprising:

first connector means for electrical connection with the signal lines of a first computer or peripheral device external conductor [sic, connector];

second connector means for electrical connection with the signal lines of a second computer or peripheral device external connector;

a plurality of conductive paths extending between said first and second connector means, each path electrically interconnecting at least one designated handshake or control signal line of said first connector means with at least one designated handshake or control signal line of said second connector means; and

enabling means responsive to an enable signal on at least one of said conductive paths for supplying a current-limited enable signal on any other of said conductive paths having an open input on one of the handshake or control signal lines corresponding thereto, said current-limited enable signal being of substantially constant current and being substantially independent of variations of the voltage of said enable signal, whereby open inputs on handshake and control signal lines are supplied with enabling signals so as to provide a function interface between said external connectors. [Emphasis added.]

[*5]

The parties agree that the mouse's allegedly infringing internal circuitry is attached to the mouse's alleged computer via pads from the mouse's circuitry soldered to pins from the mouse's computer. IQ Technologies takes the position that a set of pads is a "connector means" within claims 22, 23, and 28. It asserts that the "type of connectors is immaterial to the '698" patent, Br. for Appellant at 21; see id. at 10, 22, 45, and argues that "connector means" covers any device that electrically connects computer or peripheral devices, see id. at 22-23, 44.

IQ Technologies' construction of the claims, however, runs afoul of *35 U.S.C. § 112,* paragraph 6, which limits the literal scope of a means plus function limitation of a claim to the structure described in the specification and equivalents thereof. See *Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d 931, 933-34, 4 USPQ2d 1737, 1738-39 (Fed. Cir. 1987)* (in banc) (rejecting the same argument made here). The '698 patent claims "connector means for electrical connection." It is impermissible to define "connector means" solely by the claimed [*6] function--viz., any structure for electrical connection. The only structure actually described in the patent corresponding to connector means is male-female type plugs. n2 We therefore reject IQ Technologies' overbroad definition of connector means, and conclude that, as described in the specification and claimed, "connector means" literally are male-female type plugs and equivalents thereof for electrical connection.

**A251**

1993 U.S. App. LEXIS 16128, *; 28 U.S.P.Q.2D (BNA) 1477

n2 IQ Technologies makes much of the specification's suggestion to "tailor an interface cable assembly [] to a particular piece of equipment" by providing "specialized connectors." That a connector may be specialized does not, as IQ Technologies would have it, permit a connector to be anything. This language thus does not answer the critical question: what structure described in the specification corresponds to "connector means"?

IQ Technologies further contends that the expressly claimed "connector means" structure should be deemed "immaterial" to the patent because the patent is concerned with an [*7] "electrical apparatus" not a "mechanical apparatus." The place to delete a claim limitation believed to be immaterial to patentability is in the Patent and Trademark Office during prosecution. "Courts cannot alter what the patentee has chosen to claim as his invention . . . ." *Intervet Am., Inc. v. Kee-Vet Labs., Inc., 887 F.2d 1050, 1053, 12 USPQ2d 1474, 1476 (Fed. Cir. 1989).*

In this case, IQ Technologies has taken the above-rejected extreme position. As a result it has not presented argument supported by record evidence that pads, if not "connector means" as disclosed in the '698 patent, are nevertheless an equivalent of the described structure.

Compare *Data Line Corp. v. Micro Technologies, Inc., 813 F.2d 1196, 1201-02, 1 USPQ2d 2052, 2055-56 (Fed. Cir. 1987)* (substantial evidence of equivalence). Thus, IQ Technologies presents no genuine dispute as to equivalence under *35 U.S.C. § 112,* paragraph 6. Furthermore, although IQ Technologies has sought to raise the doctrine of equivalents as a basis for infringement, again it only contends erroneously that [*8] the connector means limitation is satisfied by any structure making an electrical connection. See, e.g., Br. for Appellant at 26 (premising doctrine of equivalents argument on literal infringement arguments made at 23-23, 44). Thus, rather than arguing as it must that pads are an equivalent of connector means, see *Becton Dickinson and Co. v. C.R. Bard, Inc., 922 F.2d 792, 797-99, 17 USPQ2d 1097, 1101 (Fed. Cir. 1990),* IQ Technologies merely restates its basic and faulty literal infringement argument, and thereby presents no genuine dispute as to equivalence under the doctrine of equivalents.

Because there is no dispute in this case that the pads of the accused devices are outside the literal scope of the properly construed claims and the evidence does not present a genuine dispute of material fact that pads are equivalent to the claimed "connector means," Microsoft is entitled to judgment of noninfringement as a matter of law. Accordingly the grant of summary judgment by the district court is affirmed.

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on August 4, 2006, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Francis DiGiovanni, Esquire
> Connolly Bove Lodge & Hutz LLP
> The Nemours Building
> 1007 North Orange Street
> Wilmington, DE  19801

I further certify that on June 30, 2006, I caused a copy of the foregoing document to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

**BY E-MAIL AND FEDEX**

> Brian P. Murphy, Esquire
> Thomas Puppa, Esquire
> Morgan Lewis & Bockius, LLP
> 101 Park Avenue
> New York, NY 10178-0060

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Karen E. Keller (No. 4489)

Karen E. Keller  (No. 4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
kkeller@ycst.com

*Attorneys for Teva Pharmaceuticals USA, Inc. and*
*Teva Pharmaceutical Industries, Ltd.*